**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| LINDA SIMS, | |
| Plaintiff, | |
| v. | Civil Action No. 17-2519 (CKK) |
| SUNOVION PHARMACEUTICALS, INC., | |
| Defendant. | |

**MEMORANDUM OPINION**
(November 20, 2020)

This is an employment discrimination case brought by Plaintiff Linda Sims against her former employer, Defendant Sunovion Pharmaceuticals, Inc. Plaintiff alleges that Defendant discriminated against her based on her race, age, and disability in violation of Title VII, the Age Discrimination in Employment Act ("ADEA"), and the Americans with Disabilities Act ("ADA"). Specifically, Plaintiff claims that she received negative performance reviews and was placed on a Performance Improvement Plan ("PIP") whereas sales representatives outside of her protected classes did not receive poor reviews and were not assigned to PIPs. Plaintiff also claims that Defendant removed target customers from her and another African American sales representative and re-assigned them to white sales representatives and that Sunovion's compensation policy benefited white employees more than African American employees. Plaintiff further alleges that her supervisor retaliated against her as a result of her engagement in protected Equal Employment Opportunity ("EEO") activity and that actions by Defendant's personnel created a hostile work environment in violation of Title VII.

Before the Court is Defendant's [47] Motion for Summary Judgment. Defendant argues that it is entitled to summary judgment on Plaintiff's discrimination and retaliation claims

1

because Plaintiff has failed (1) to demonstrate any actionable adverse employment actions; and

(2) to offer evidence of discriminatory pretext to rebut Defendant's legitimate reasons for its

actions.  Defendant also argues that it is entitled to summary judgment on Plaintiff's hostile work

environment claim because she has not shown sufficiently severe or pervasive conduct connected

to her race, age, or disability.

Upon consideration of the pleadings,[1] the relevant legal authorities, and the record as a

whole, the Court shall GRANT IN PART and DENY IN PART Defendant's motion:

- The Court GRANTS summary judgment to Defendant on Plaintiff's racial discrimination claim under Title VII (Count 1) to the extent it relies on Plaintiff's negative performance review, PIP placement, and Defendant's compensation policy because Plaintiff has produced no evidence showing that Defendant's proffered reasons for its actions are pretext for racial discrimination.

- The Court, however, DENIES summary judgment to Defendant on Plaintiff's racial discrimination claim (Count 1) insofar as it relies on Defendant's "removal" of target customers from Plaintiff and another African American sales representative and assignment of those customers to white sales representatives. On this point only, Plaintiff has produced sufficient evidence of discriminatory pretext to submit these allegations to a jury.

- The Court GRANTS summary judgment to Defendant on Plaintiff's age discrimination (Count 3) and disability discrimination (Count 4) claims because Plaintiff has failed to show that Defendant's proffered non-discriminatory reasons for its actions are pretextual, and Plaintiff has offered no evidence connecting Defendant's actions to her age or disability.

---

[1] The Court's consideration has focused on the following documents and their attachments and/or exhibits:  Def.'s Mot. for Summary Judgment, ECF No. 47 ("Def.'s Mot."); Pl.'s Opp'n to Def.'s Mot. for Summary Judgment, ECF No. 50 ("Pl.'s Opp'n"); and Def.'s Reply in Support of Mot. for Summary Judgment, ECF No. 51 ("Def.'s Reply").  In an exercise of its discretion, the Court finds that holding oral argument in this action would not be of assistance in rendering a decision. *See* LCvR 7(f).

- The Court GRANTS summary judgment to Defendant on Plaintiff's retaliation claims (Count 5) because there are no genuine disputes of material fact as to whether Plaintiff's supervisors knew about her protected EEO activity.

- The Court GRANTS summary judgment to Defendant on Plaintiff's hostile work environment (Count 6) claim because Plaintiff has failed to produce evidence of pervasive or harassing conduct related to her race.

## I. BACKGROUND

### A. Procedural Background

Plaintiff filed this lawsuit on November 21, 2017.  *See* Compl., ECF No. 1.  Plaintiff twice amended her Complaint. *See* Am. Compl, ECF No. 17; Sec. Am. Compl. No. 27.[2] Plaintiff's Second Amended Complaint contains nine counts against Sunovion: (1) racial discrimination in violation of Title VII; (2) sex discrimination in violation of Title VII; (3) age discrimination in violation of the ADEA; (4) disability discrimination in violation of the ADA; (5) retaliation for engaging in protected EEO activity; (6) discrimination and creation of a hostile work environment and constructive discharge in violation of Title VII; (7) discrimination and creating of a hostile work environment in violation of the D.C. Age Discrimination Law and the D.C. Human Rights Act ("DCHRA"); (8) failure to pay overtime wages in violation of the Fair Labor Standards Act ("FLSA"); and (9) failure to pay overtime wages in violation of D.C. law. *See* Sec. Am. Compl. ¶¶ 26-61.

Defendant moved to dismiss Plaintiff's Second Amended Complaint, which the Court granted in part and denied in part.  *See* Def.'s Mot. to Dismiss, ECF No. 22; Order, ECF No. 25. The Court dismissed in full Count 2 (sex discrimination), Count 7 (violations of DCHRA), and Counts 8 and 9 (overtime wage violations) of the Second Amended Complaint.  *See* Order, ECF

---

[2] Thought titled "Amended Complaint," the operative Complaint in this action is Plaintiff's Second Amended Complaint, ECF No. 27.

No. 25.  The Court also dismissed the Count 6 claims of discrimination and creation of a hostile

work environment on the basis of sex and constructive discharge.  *Id.*  And the Court dismissed

Plaintiff's race, age, and disability discrimination claims to the extent they rely on employment

decisions or actions pre-dating January 6, 2016.  *Id.*

After completion of discovery, Defendant filed the present Motion for Summary

Judgment on Plaintiff's remaining claims.  For the sake of clarity, those claims are:

- Counts 1, 3, and 4: Race, age, and disability discrimination in violation of Title VII, the ADEA, and the ADA, based on employment decisions and actions occurring on or after January 6, 2016;

- Count 5: Retaliation for engaging in protected EEO activity in violation of Title VII; and

- Count 6: Discrimination and creation of a hostile work environment in violation of Title VII.

For each of these remaining counts, Plaintiff claims she suffered four adverse employment

actions because of her protected class or activity: (1) Plaintiff received a negative performance

review in June 2016 based on her FY2015 sales performance; (2) she was placed on PIP in

August 2016; (3) one of Plaintiff's target customers was removed from her and re-assigned to

another sales representatives; and (4) she was subject to an unfair "multiplier" compensation

policy.

**B.  Factual Background**

In presenting the facts pertinent to resolving the present motion, this Court "assume[s]

that facts identified by the moving party in its statement of material facts are admitted, unless

such a fact is controverted in the statement of genuine issues filed in opposition to the motion."

LCvR 7(h)(1).  In most instances the Court shall cite to [47-1] Defendant's Statement of Material

Undisputed Facts ("Def.'s Stmt.") unless Plaintiff disputes or controverts relevant aspects of a

fact proffered by Defendant.  In such instances, the Court shall also cite to [50-1] Plaintiff's

4

Statement of Disputed Material Facts ("Pl.'s Stmt.").  The Court shall also cite directly to the record, where appropriate, to provide additional information not covered by Defendant's Statement.

Ms. Linda Sims is an African American and Korean female veteran who was at least 40 years old during all times relevant to her Complaint.  Def.'s Stmt. ¶ 1; *see also* Pl.'s Opp'n Ex. A, Sworn Declaration of Linda Sims ("Pl.'s Decl.") ¶ 3.  Plaintiff was employed as a salesperson by Defendant Sunovion Pharmaceuticals, Inc. from May 2006 until October 1, 2016.  Def.'s Stmt. ¶ 1.  Beginning in 2008, Plaintiff worked as a specialty market sales representative, responsible for sales of pharmaceutical products to medical professionals in a territory including the District of Columbia and parts of Maryland.  Def.'s Stmt. ¶¶ 3-6.  Defendant requires its sales personnel to meet designated sales quotas for their assigned products within a specified region.  Def.'s Stmt. ¶ 5.

Plaintiff's claims center on her interactions with two supervisors, Ms. Livia Warden, her supervisor from 2009 until 2012, and Ms. Jennifer Russell, Plaintiff's supervisor from January 2016 until her resignation in October 2016.  Def.'s Stmt. ¶¶ 8, 9, 26, 50.  Because only those employment decisions occurring on or after January 6, 2016 are actionable with respect to Plaintiff's surviving discrimination claims, the bulk of Plaintiff's remaining claims concern events during Ms. Russell's tenure as Plaintiff's supervisor.  *See* Mem. Op., ECF No. 26 at 15, 24 n.7.  However, because Plaintiff's interactions with Ms. Warden underly her hostile work environment claim and provide context for her retaliation claim, the Court shall first briefly

present the facts pertinent to Plaintiff's interactions with Ms. Warden before addressing the facts

underlying her claims with respect to Ms. Russell's tenure.[3]

### 1. Plaintiff's Interactions with Ms. Warden (2009-2012)

Livia Warden, a white female over 40 years old became Plaintiff's supervisor in 2009.

Def.'s Stmt. ¶ 8; Def.'s Mot. Ex. 3, Dep. of Livia Warden ("Warden Dep.") at 12:1-2; 17:2-9.

Plaintiff was "one of twelve sales representatives" under Ms. Warden's supervision and "the

only sales representative who was an African American female and over forty years of age."

Pl.'s Decl. ¶ 8.  Plaintiff claims that Ms. Warden (a) refused to approve reimbursement for

Plaintiff's business expenses during travel to the Eastern Shore of Maryland; (b) brought

Plaintiff an alcoholic beverage at conference when she had not requested one and attempted to

trick Plaintiff into drinking it; and (c) changed Plaintiff's territory, removed her clients, and

assigned them to non-African American sales representatives.  *Id.* ¶¶ 9-11.  Ms. Warden denied

these claims in her deposition, testifying that she did not reject Plaintiff's travel reimbursement

requests, that she never brought Ms. Sims any alcoholic drink, and that she was not responsible

for assigning territories to sales representatives.  Def.'s Stmt. ¶¶ 10-13; Warden Dep. at

27:11-30:2; 35:10-38:5; 45:19-22.

In 2012, Plaintiff received a "Partially Meets Expectations" rating in an annual

performance review conducted by Ms. Warden and was subsequently placed on a Performance

Improvement Plan ("PIP") for failing to meet her sales goals.  Def.'s Stmt. ¶ 15.  Ms. Warden

---

[3] The Court concluded in its [26] Memorandum Opinion that Plaintiff's allegations relating to
Ms. Warden's supervision from 2009 until 2012 were not time barred with respect to Plaintiff's
hostile work environment claim because they "involved the same type of employment actions as,
and were perpetrated by a supervisor directly connected to, Plaintiff's non-time barred
allegations."  Mem. Op. at 24 n.7 (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 526 U.S. 101,
120-21 (2002)).

testified that she would have been required to assign a "Partially Meets Expectations" rating based on objective criteria provided to her by the company—the same criteria applied to all sales personnel nationwide.  *See* Warden Dep. 50:7-20 ("If I gave her a 'partially meets,' which I believe I did, it would have been in line with the criteria that was established across the nation, and based on the performance of every therapeutic specialty in the nation.  And if she was rated 'PM,' it was due, in part, mainly to lack of quota achievement.  And we were consistent across the country.  We did the same criteria to make those evaluations.").  Plaintiff claims that she had exceeded her sales quotas in 2011 and that the PIP was "retaliatory" and the result of Ms. Warden "chang[ing] the timelines" and "diminish[ing] Plaintiff's territory."  Pl.'s Stmt. ¶ 15. But Plaintiff offers no evidence in the record to support her characterization of her sales performance during the period for which she received this rating.  Plaintiff cites only to paragraphs of her own declaration which contain factual assertions and allegations unrelated to her sales performance during the time period relevant to her 2012 performance review.  *See* Pl.'s Stmt. ¶ 15 (citing "Plaintiff Ex. A at 10, 11 and 12"); Pl.'s Decl. ¶¶ 10-12.

Plaintiff reported what she considered to be Ms. Warden's discriminatory treatment of her to Defendant's human resources department in 2012.  Pl.'s Decl. ¶ 12.  Plaintiff then took disability leave from February to April of 2012, due to stress, depression, and anxiety. Def.'s Stmt. ¶ 16.  Ms. Warden testified that she did not know that Plaintiff had a disability or went on leave due to a disability.  Def.'s Stmt. ¶ 17; Warden Dep. 53:17-54:8.  Plaintiff does not dispute

that Ms. Warden was unaware of her disability and did not know that Plaintiff went on leave because of a disability. *See* Def.'s Stmt. ¶ 17.[4]

After returning from leave in 2012, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission regarding Ms. Warden's alleged discriminatory treatment of her.  Def.'s Stmt. ¶ 18; Pl.'s Decl. ¶ 12.  Plaintiff subsequently withdrew her EEO charge, though Plaintiff does not specify on the record when she withdrew the complaint.  *See* Def.'s Stmt. ¶ 18; Pl.'s Decl. ¶ 12.  Ms. Warden did not know that Plaintiff had filed an EEO charge against her in 2012 until Plaintiff initiated this lawsuit in 2017.  Def.'s Stmt. ¶¶ 19, 22. Plaintiff does not dispute that Ms. Warden was unaware of her EEO charge.  Def.'s Stmt. ¶ 19; Pl.'s Stmt. ¶ 19.  At some point in 2012, Ms. Warden took on a new position with Defendant as a regional sales director, which did not include supervising Plaintiff's territory.  Def.'s Stmt. ¶ 20. Plaintiff withdrew her EEO charge of discrimination because Ms. Warden was no longer her supervisor.  Pl.'s Decl. ¶ 12.  The EEOC closed Plaintiff's 2012 file without investigation. Def.'s Stmt. ¶ 51.

### 2.  Incidents During Ms. Russell's Tenure as Plaintiff's Supervisor (2016)

Ms. Jennifer Russell became Plaintiff's supervisor on January 19, 2016.  Def.'s Stmt. ¶ 26.  Ms. Russell is a white female who was over the age of 40 when she became Plaintiff's supervisor.  *Id.*   As previously noted, Plaintiff's remaining claims largely hinge on employment actions during Ms. Russell's tenure as Plaintiff's supervisor.  Specifically, Plaintiff's discrimination and retaliation claims are premised on (1) Plaintiff's receipt of a negative

---

[4] Plaintiff does not respond to this paragraph of Defendant's Statement.  Pursuant to Local Civil Rule 7(h)(1), the Court shall treat the factual allegations to which Plaintiff does not respond as admitted.

performance review in June 2016 based on her FY2015 sales performance; (2) Plaintiff's PIP

placement in August 2016; (3) Defendant's "removal" of target customers from Plaintiff; and (4)

Defendant's "multiplier" policy.  After discussing in detail each of these four actions, the Court

shall discuss additional incidents underlying Plaintiff's claims and additional facts pertinent to

Plaintiff's retaliation claim.

### a.   "Partially Meets Expectations" Rating for FY2015

During Defendant's 2015 fiscal year (April 1, 2015 – March 31, 2016), Plaintiff was

responsible for selling two products: Brovana and Aptiom.  Def's Stmt. ¶ 6.  Although Plaintiff

had previously been evaluated based on her sales of Brovana, Aptiom was new to her

performance review for the 2015 fiscal year.  *See* Def.'s Mot. Ex. 1, Pl.'s Dep. Ex. 3, 2014

Annual Performance Review dated 6/15/2015 ("FY2014 Review") at SUNOVIAN 0001047

(noting that the "addition of APTIOM" would present "another challeng[e]"); *see also* Pl.'s Stmt.

¶¶ 27-29 ("[Plaintiff] was not rated on the sales of Aptiom for FY2014.").

During the 2015 fiscal year, Plaintiff was on notice that she had fallen short of quota

expectations for the previous fiscal year.  Plaintiff's annual performance review for the 2014

fiscal year (which Plaintiff received in June 2015) notes: "As seen in the results above, you have

missed quota expectations and fallen below quota payout (as averaged) for Brovana over the

second half of the year as identified in the quarterly [Incentive Compensation Plan].  Next year it

will be imperative for your market place to perform at or above sales expectation on portfolio

execution to ensure success."  FY2014 Review at SUNOVIAN 0001048.  Plaintiff offers no

evidence to controvert Defendant's characterization of her performance during the 2014 fiscal

year.  She only notes that she was "at Expectations" and was not assigned to a PIP during that

time period.  Pl.'s Stmt. ¶¶ 24, 25; Pl.'s Decl. ¶ 13.

Plaintiff continued to fall short of her sales quotas during the 2015 fiscal year.  The record suggests that Plaintiff and other sales representatives in her area struggled with Aptiom sales.  For example, on July 20, 2015, Plaintiff's then-supervisor, Mr. Darcy Hayes, emailed Plaintiff and other sales representatives indicating that it was "imperative that EVERY TS [sales representative] gets Aptiom on board as you can see below BROVANA alone is not going to get you on the boat.  Our Region needs to have every TS execute at least 1 Aptiom script, that is an AREA expectation."  Pl.'s Opp'n Ex. E, 7/20/2/15 Email from Darcy Hayes, at P000081.  On August 6, 2015, Mr. Hayes sent another message to his team with a "scorecard" of sales figures as of July 10, 2015.  *See* Pl.'s Opp'n Ex. E, 8/6/2015 Email from Darcy Hayes, at P000082.  The scorecard indicates that Plaintiff had 80.03% "actual attainment" for Brovana and 0% for Aptiom.  *Id.*  It also shows that 21 other sales representatives also had 0% attainment for Aptiom. *Id.* at P000083.

In November 2015, Plaintiff received a mid-year performance review.  *See* Def.'s Mot. Ex. 1, Pl.'s Dep. Ex. 4, 2015 Mid-Year Check-In dated 11/18/2015 ("FY2015 Mid-Year Review") at SUNOVIAN 0000820.  The review indicates that Plaintiff achieved 0% of her Aptiom quota through the first half of the fiscal year.  *Id.* at SUNOVIAN 0000821.  During the same time period, Plaintiff attained 104.01% of her Brovana goal during the first trimester and 96.78% attainment for the first half of the second trimester.  *Id.*  This evidence demonstrates that Plaintiff was aware of her Aptiom sales shortfalls *before* Ms. Russell became her supervisor in January 2016 (near the end of Defendant's 2015 fiscal year, which concluded March 31, 2016).

On June 22, 2016, Ms. Russell and her supervisor, Mr. Wolfgang Freund, conducted Plaintiff's performance review for the 2015 fiscal year.  Def.'s Stmt. ¶ 28; Pl.'s Decl. ¶ 25.  By the end of the 2015 fiscal year, Plaintiff ranked among the last in sales based on her combined

attainment for both of her products.  Def.'s Stmt. ¶ 34. Plaintiff's FY2015 performance review

notes Plaintiff's sales figures:

- FY 2015 Trimester 1:
  - Brovana quota attainment: 104.01%
  - Aptiom quota attainment: 0%
  - Combined scorecard payout: 81.23%
  - Combined scorecard rank: 29/48
- FY 2015 Trimester 2:
  - Brovana quota attainment: 98.66%
  - Aptiom quota attainment: 0%
  - Combined scorecard payout: 66.25%
  - Combined scorecard rank: 36/45
- FY2015 Trimester 3:
  - Brovana quota attainment: 95.9%
  - Aptiom quota attainment: 12.14%
  - Combined scorecard payout: 62.16%
  - Combined scorecard rank: 39/44

Def.'s Mot. Ex. 1, Pl.'s Dep. Ex. 10, 2015 Annual Performance Review ("FY2015 Review") at

SUNOVIAN 0000834-000035.  The review also notes that Plaintiff's "combined 2015 Brovana

and Aptiom attainments were below the established quota assignments for your territory" and

that Plaintiff "had a decline in overall performance each trimester in FY2015."  *Id.* at

SUNOVION 0000834-000035.  The report further indicates: "Aptiom had zero attainment 2 out

of 3 quarters in FY2015 which is not acceptable moving forward."  *Id.* at SUNOVIAN 0000834.

As a result of these sales figures, Plaintiff received a "Partially Meets Expectations" rating.

Def.'s Stmt. ¶ 28.

Plaintiff's "Partially Meets Expectations" rating was based objectively on how her

performance "stack ranked" against all other sales representatives' quota attainment.  *See* Russell

Dep. 47:11-17 ("HR gives [managers] the sheet of how everyone has stack ranked in the nation

and, then, that curve is applied. And you fall out wherever on the curve in order to receive either

an outstanding, an exceeding, an achieves, a partially meets and a does not meets is my

11

understanding."); *id.* at 47:18-24 ("I'm required to give [the sales representative] whatever rating aligned with . . . where they fell out in that stack rank. I can't choose to give them a different rating."); *see also* Warden Dep. 50:7-20 ("If I gave her a 'partially meets' . . . it would have been in line with the criteria that was established across the nation, and based on the performance of every therapeutic specialist across the nation . . . And we were consistent across the country. We did the same criteria to make those evaluations."). That is, Defendant's evidence establishes that Plaintiff's performance review was based objectively on how Plaintiff's sales results compared to those of her colleagues. Plaintiff produces no evidence to controvert Defendant's evidence that her rating was based on an objective measurement of her performance compared to her peers' performance.

Plaintiff offers three responses to Defendant's evidence of her deficient sales performance during the 2015 fiscal year—none of which directly controvert the fact that she did not achieve her sales quotas for *both* Brovana *and* Aptiom *throughout* the 2015 fiscal year. *See* Pl.'s Stmt. ¶¶ 27-29. First, Plaintiff states that "[b]eginning in 2012, I was told that I should focus on selling Brovana," including by a senior executive who told her that "Brovana keeps the lights on." Pl.'s Decl. ¶ 14. Plaintiff also points to the July 2015 scorecard to conclude that Aptiom was "peripheral" to Defendant's sales goals because it shows that Plaintiff and 21 other sales representatives had not made any sales of Aptiom. *See* Pl.'s Stmt. ¶¶ 27-29 (citing Pl.'s Opp'n Ex. E, 8/6/2015 Email from Darcy Hayes at P000083). But in an earlier email to Plaintiff and other sales representatives, Mr. Hayes plainly stated that it was "imperative" for every sales representative to "get[ ] Aptiom on board as you can see below BROVANA alone is not going to get you on the boat" and that it was an "AREA expectation" for each representative to "execute at least 1 Aptiom script." Pl.'s Opp'n Ex. E, 7/20/2015 Email from Darcy Hayes at P000081.

Accordingly, the Court finds that even if Plaintiff was told to "focus" on Brovana sales beginning in 2012, she was also on notice of the "expectation" to execute Aptiom sales during the 2015 fiscal year.

Plaintiff's second response is that she met "the projected *Brovana* sales" in 2015, whereas two of her white colleagues, Ms. Jannie Camper and Mr. Jason Mitchell, failed to do so, but neither colleague received a "Partially Meets Expectations" rating.[5]  Pl.'s Stmt. ¶¶ 27-29 (emphasis added).  Again, this assertion does not controvert Defendant's evidence that *Plaintiff* failed to achieve her FY2015 sales goals for *both* products.  Moreover, the portions of the record cited by Plaintiff do not support the proposition that both colleagues failed to achieve their Brovana *and* Aptiom quotas *throughout* the 2015 fiscal year.  Plaintiff relies only on the "scorecard" dated July 2015 to show that Ms. Camper and Mr. Mitchell ranked lower in sales than she did.  *See* Pl.'s Stmt. ¶¶ 27-29 (citing Pl.'s Opp'n Ex. E).  But this data does not show Ms. Camper's or Mr. Mitchell's performance for the *entire* FY2015 review period; it merely shows a snapshot of their quota attainment until that point in the 2015 fiscal year.  *See* Pl.'s Opp'n Ex. E, 8/6/2015 Email from Darcy Hayes.  And even considering this snapshot of data as of July 2015, Mr. Mitchell had achieved 386.88% of his Aptiom attainment and Ms. Camper had achieved 59.25% of her Aptiom goal, whereas Plaintiff had attained 0%.  *Id.*  Plaintiff provides no other evidence showing that these two representatives had similar sales figures to her

---

[5] Plaintiff also contends that Mr. Mitchell failed to meet his sales quotas in 2014.  *See* Pl.'s Stmt. ¶¶ 27-29.  But the data she cites for this proposition is the same July 2015 scorecard she relies on to demonstrate her colleagues' *2015* performance.  *Id.*  This confusion may stem from the subject line of the email: "7.10.2014 Scorecard."  See Pl.'s Opp'n Ex. Ex at P000082.  However, the filename for the scorecard indicates that the scorecard is dated July 10, *2015*. *Id.* And the text of the email (dated August 6, 2015) indicates that this is "the most recent scorecard."  Accordingly, the Court concludes that this email presents data relevant to the 2015 fiscal year.

*throughout* the 2015 fiscal year or that they continued to fall short of quota attainments for *both* Aptiom and Brovana.  Plaintiff does not provide any basis other than conclusory assertions to establish that Mr. Mitchell and Ms. Camper continuously failed to meet their quotas for both products.

Third, Plaintiff responds that Defendant's "multiplier" system "in or around 2016" helped other representatives meet their sales goals whereas she was "forced to meet a higher sales quota" to "obtain the same awards" as her colleagues.  Pl.'s Stmt. ¶¶ 27-29.  The Court shall discuss this so-called "multiplier" system in greater detail, *infra* Section I(B)(2)(d).  But even assuming Plaintiff's rationale that this "multiplier" system contributed to her deficient sales performance, she offers no evidence supporting her contention that this policy was introduced "abruptly" in 2016; rather, the Incentive Compensation Policy for FY2015 plainly contemplated discrepancies between "small" and "large" territory payouts, *see infra* I(B)(2)(d); Pl.'s Stmt. ¶¶ 27-29.  And even if it were only introduced in 2016, Plaintiff offers no evidence suggesting this policy would have affected her *2015* fiscal year sales performance, which was the basis for her "Partially Meets Expectations" rating.  Accordingly, the Court finds that Plaintiff's contention about an unfair "multiplier" policy has no bearing on her receipt of a "Partially Meets Expectations" rating for her 2015 fiscal year performance.

During her performance review, Plaintiff was advised that if she did not make progress in meeting her sales quotas within 60 days, she would be placed on a PIP.  Def.'s Stmt. ¶ 30.  Ms. Russell testified that there were no other consequences associated with Plaintiff's receipt of a "Partially Meets Expectations" rating.  *Id.* ¶ 31 (citing Russell Dep. 43:10-13).  Plaintiff offers

several responses to this point, but none directly controvert it.[6]  *See* Pl.'s Stmt. ¶ 31.

Accordingly, the Court concludes that other than her potential placement on a PIP, there were no

other consequences associated with Plaintiff's receipt of a "Partially Meets Expectations" rating.

### b.  Performance Improvement Plan

Plaintiff was assigned to a PIP on August 26, 2016.  Def.'s Stmt. ¶ 32. The PIP notes that

Plaintiff had fallen short of her Aptiom quota through the first quarter of FY2016 and continued

to struggle with her quota attainment into the second quarter:

- FY 2016 Quarter 1:
  - Brovana quota attainment: 101.28%
  - Aptiom quota attainment: 32.40%
  - Combined payout: 83.3%
  - Area rank: 31/46
  - National rank: 106/156
- FY 2016 Quarter 2 (projected based on scorecard dated 8/23/2016):
  - Brovana quota attainment: 88.07%
  - Aptiom quota attainment: 0%
  - Combined payout: 36.6%
  - Area rank: 46/48
  - National rank: 150/158

Def.'s Mot. Ex. 1, Pl.'s Dep. Ex. 11, PIP at SUNOVIAN 0000223.

The PIP was designed to improve Plaintiff's sales and required Plaintiff to "demonstrate

quantitative improvement in meeting or exceeding 100% of quota." *Id.* at SUNOVIAN 0000224.

It set forth expectations for Plaintiff to improve her sales, requiring her to conduct speaker

---

[6] Plaintiff's own declaration, in fact, contradicts her allegations in response to Defendant's statement that there were no consequences of her "Partially Meets Expectations" rating (other than a potential PIP) because she claims in her declaration that the events she lists as "consequences" in her Statement of Facts occurred *before* she ever received her performance review on June 22, 2016. *See* Pl.'s Stmt. ¶ 31; *see, e.g.*, Pl.'s Decl. ¶ 21 (stating she was not supported in her position in "April and/or May 2016"); *id.* ¶ 22 (claiming that a target was removed from her in May 2016); *id.* ¶¶ 24-25 (claiming that Ms. Russell called her "un-coachable" the day before her performance review).

programs for Aptiom and to engage in sales strategy planning with Ms. Russell, including through weekly telephone calls. *Id.* at SUNOVIAN 0000224-0000225.

Plaintiff claims that she asked Ms. Russell and Mr. Freund whether she would have "satisfactory performance" by obtaining 100% of her quota for both Brovana and Aptiom. Pl.'s Decl. ¶ 26. She claims that Mr. Freund told her, "No, because I am not going to let my manager work with someone when we don't know where she is coming from." *Id.* Plaintiff claims that this comment led her to believe that she could not succeed during the PIP. *Id.* Plaintiff further claims—and Defendant does not dispute—that her placement on a PIP disqualified her from applying for a sales trainer position. *Id.* ¶ 28.

### c. Removal of Target Customers

According to Plaintiff, in "April or May 2016," Defendant's management approved the re-assignment of a "target" customer within Plaintiff's territory to another division of the company, resulting in a white sales representative benefiting from that customer's business. Pl.'s Decl. ¶ 22 ("Despite my protests, the removal of Dr. Tuli as my target was approved by Ms. Russell to give to Leonora Merkey, a Caucasian female in April/May 2016."). It is undisputed that Plaintiff's territory throughout her tenure at Sunovion covered Washington, D.C. and parts of Maryland. Def.'s Stmt. ¶ 3; Pl.'s Dep. 57:13-19, 227:10-19. But Plaintiff claims that Ms. Russell caused Plaintiff's territory to be "diminished" by approving the assignment of one of Plaintiff's target customers in her area to another division of Sunovion. Pl.'s Stmt. ¶¶ 3, 44; Pl.'s Decl. ¶¶ 22, 27.

In support of her Opposition to Defendant's Motion for Summary Judgment, Plaintiff submits a declaration by Mr. Marrell Elam, an African American co-worker, who states: "In June 2016, certain hospitals, durable medical equipment companies, nursing homes and physicians,

16

were removed from my territory and given to [Ms.] Camper" (a white female).  Pl.'s Opp'n Ex.
B, Decl. of Marrell C. Elam ("Elam Decl.') ¶ 6.  Mr. Elam further states that he complained
about the changes to his territory to Ms. Russell and her supervisor and no action was taken.  *Id.*
He also "believe[s] that Ms. Russell . . . [was] aware of the changes to our territory which
favored Caucasian employees based on the failure to address the disparate treatment[.]"  *Id.*

Defendant presents evidence to dispute Plaintiff's claim that Ms. Russell removed target
customers from her and Mr. Elam.  Ms. Russell testified in her deposition that she "did not recall
making any changes to territory," that she is "not the one who normally makes territory
changes," and that she did not recall "reassigning any doctors."  Russell Dep. 27:2-8; 59:3-11.
Ms. Russell also testified that she does not "reassign specific customers."  *Id.* at 60:6-9.
According to Ms. Russell, targets were aligned with zip codes and she did not have the authority
to "take targets out of a zip code."  *Id.* at 62:8-63:9.  Rather, a sales representative would have to
"initiate" a request to adjust the zip codes for which he or she was responsible.  *Id.*  Ms. Russell
testified that "someone else" (other than her) would have to approve the request.  *Id.* 62:19-63:9.
It is unclear from the record *who* the "someone else" would have been.

### d.  Defendant's Compensation Policy

Pursuant to Defendant's FY2015 Incentive Compensation Plan ("FY2015 ICP"), a sales
representative's performance was measured by his or her quota attainment (sales divided by
assigned quota).  *See* Def.'s Mot. Ex. 1, Pl.'s Dep. Ex. 8, FY2015 ICP at 9.  The representative's
"quota attainment" was then translated to a "payout" using a "payout curve" designed for each
sales team.  *Id.*  Each team's "curve" was designed to equalize earning opportunity across
products and territories.  *Id.*  The FY2015 ICP notes, for example, that "large territories may
have more predictable future sales than small territories on the same sales team and a separate

17

payout curve with additional leverage may be used for large territories." *Id*. at 9.  The ICP

provides that "specialty market" sales personnel responsible for Brovana sales "will have one of

two payout curves, determined by quota size (volume)." *Id.* at 30.  For each curve, an

incremental increase in attainment resulted in an increased payout percentage. *Id.* at 30-31.  For

example, for a "small territory" attainment between 75% and 110%, each 1% increase in

attainment would result in a 4% increase in payout. *Id.* at 30.  In contrast, for a "large territory"

attainment between 80% and 100%, each 1% increase in attainment would result in a 5%

increase in payout and attainments between 100% and 110% resulted in a 6% increase in payout.

The FY2015 ICP (including its payout curves) was "reviewed and approved" by Defendant's

senior executives. *Id.* at 35.

Plaintiff claims that Defendant's compensation policy—including the incremental

"multipliers" based on territory classification—unfairly burdened her and Mr. Elam by forcing

them to meet a "higher sales quota" in order "to obtain the same awards as their non-African

American counters." Pl.'s Decl. ¶ 7.  According to Plaintiff, she and Mr. Elam were designated

as "small market" sales representatives who were required to achieve 110% of their sales quotas

before getting the benefit of the "multiplier" whereas white sales representatives were designated

as "large market" sales representatives who only had to achieve 100% of their sales goals. *Id.*

Although the record shows that Plaintiff and Mr. Elam were indeed classified as "small"

territory representatives, it does not (as Plaintiff suggests) show that they were the only people

who were affected by this compensation policy. *See* Pl.'s Stmt. ¶¶ 27-29; Pl.'s Decl. ¶ 7.

Plaintiff herself indicated in her discovery responses that a white male employee on her same

sales team, Mr. Jason Mitchell, had the same "small" territory designation. Pl.'s Opp'n Ex. C,

Pl.'s Interrogatory Resps. at 17.  And evidence produced by Defendant confirms that Mr.

Mitchell and several other sales representatives (whose races are not identified) were designated as "small" territory representatives. *See* Def.'s Reply Ex. 1 at SUNOVIAN 0000709-0000712. Accordingly, the Court finds that Plaintiff and Mr. Elam were not the only sales representatives to whom the "small" territory "multiplier" applied.

### e.   Other Incidents in 2016

In addition to the four events described above, Plaintiff complains of several other incidents that occurred in 2016. Most notably, in March 2016, Plaintiff attended a meeting of approximately twelve sales representatives led by Ms. Russell. Def.'s Stmt. ¶ 48. Ms. Russell gave each attendee a key to symbolize "owning their business . . . just as they own a car." *Id.*; *see* Russell Dep. 30:1-9. Ms. Russell gave Plaintiff a pink key with a diamond-like stone and the word "Diva." Def.'s Stmt. ¶ 48; Pl.'s Decl. ¶ 19. Ms. Russell did not give any white sales representatives keys with the word "Diva." Russell Dep. 33:5-7. Plaintiff was offended by this key because she understood "Diva" to be a term used to "describe African American women who are perceived to be high maintenance." Pl.'s Decl. ¶ 19. Ms. Russell testified that she thought "Diva" stood for someone "glamorous" or "famous." Russell Dep. 30:21-24. At the same meeting, Ms. Russell gave Mr. Elam a key with "M&M" candies, explaining that he likes to eat a lot. Pl.'s Stmt. ¶ 48; Pl.'s Decl. ¶ 19. Plaintiff recalls that Ms. Russell gave a white male sales representative a key with an American flag on it, explaining that he was an "All American guy." Pl.'s Decl. ¶ 19.

At the same March 2016 meeting, Ms. Russell used leprechaun and shamrock images in her presentation because the annual award for the highest achieving sales representative was a trip to Ireland. Def.'s Stmt. ¶ 49. Plaintiff recalls that Ms. Russell used a slide with a picture of a dancing leprechaun to introduce Mr. Elam and that he commented that he was "offended" by

this image of a "short dancing person." Pl.'s Decl. ¶ 19. Although Mr. Elam recalled this incident, he did not state that he was offended or understood the dancing leprechaun to be a racial stereotype. *See* Elam Decl. ¶ 5.

Plaintiff provides only the barest factual content regarding a number of other alleged incidents. These incidents, together with the events described above during both Ms. Warden's and Ms. Russell's tenures appear to form the basis of Plaintiff's hostile work environment claim:

- Plaintiff claims that Ms. Russell's supervisor asked her during the March 2016 sales team meeting if she gets medical treatment from the Veteran's Administration. Pl.'s Decl. ¶ 20. Plaintiff considered this question "invasive." *Id.*

- Plaintiff claims that she was denied "support" by Ms. Russell in "April and/or May 2016." *Id.* ¶ 21. Plaintiff suggests that Ms. Russell withheld data she needed for meetings with customers. *Id.*

- Plaintiff contends that a business plan she created was presented to Defendant's leadership in May 2016, but her contribution was not included in any performance evaluation. *Id.* ¶ 23.

- Plaintiff further claims that during a field call with Ms. Russell in June 2016, Ms. Russell called Plaintiff "un-coachable and the worst person she had ever coached in her entire history of coaching." Pl.'s Decl. ¶ 24. Ms. Russell testified that she did not tell Plaintiff that she was the "worst employee" she had ever managed, but rather told her that she was one of the "most challenging" people that Ms. Russell had ever coached and that she "did not accept constructive feedback very well." Russell Dep. 43:14-23.

- During this same field call, Plaintiff recalls that Ms. Russell "demanded" she check a text message on her phone while she was driving a company car, knowing that a sales representative could be fired for doing so. Pl.'s Decl. ¶ 24.

- Plaintiff claims that in a meeting with Ms. Russell and an HR representative in 2016, she was "berated" by the HR representative for "asking someone for help in doing [her] job." *Id.* ¶ 30.

- Plaintiff also contends that her "weekly coaching calls" were not coaching, but "a berating of her on the phone." *Id.* ¶ 26.

For each of these incidents, Plaintiff cites only the assertions in her own declaration and no other evidence on the record. Defendant does not rebut these claims in its Reply. Instead, Defendant

argues that Plaintiff has conceded that these "perceived slights" do not "amount to adverse employment actions" by failing to address them in her Opposition.  Def.'s Reply at 6 n.2.[7]

### 3. Plaintiff's Retaliation Claim

The Court shall briefly discuss the facts underlying Plaintiff's retaliation claim.  Plaintiff broadly alleges that Ms. Russell's actions in 2016 were in retaliation for Plaintiff's EEO charge against Ms. Warden in 2012.  *See* Sec. Am. Compl. ¶ 16.  Ms. Warden and Ms. Russell, however, both testified that they never discussed Plaintiff.  Def.'s Stmt ¶ 55; Warden Dep. 26:17-27:4; Russell Dep. 27:9-11.  Ms. Warden testified that she was unaware of Plaintiff's EEO charge against her in 2012.  Def.'s Stmt. ¶ 19; Warden Dep. 54:15-55:2.  Ms. Russell also testified that she did not know that Plaintiff had filed any EEO charge against Ms. Warden in 2012.  Def.'s Stmt. ¶ 56; Russell Dep. 52:6-13.

Plaintiff does not dispute that neither of her supervisors was aware of her 2012 EEO charge.  *See* Pl.'s Stmt. ¶¶ 19, 56.  Nor does Plaintiff dispute or offer any evidence beyond her own speculation to controvert Defendant's evidence that her former supervisors never discussed Plaintiff.  *See* Pl.'s Stmt. ¶ 55.  The only evidence Plaintiff cites in support of her retaliation theory is her own EEO complaint filed in 2016 (after her resignation from Sunovion), in which Plaintiff claims that Ms. Warden and Ms. Russell attended the same "managers meeting" in May 2016 and that Ms. Russell's "attitude towards [Plaintiff] drastically changed" after this meeting.  Pl.'s Opp'n at 5 (citing Pl.'s Opp'n Ex. D., Pl.'s Charge of Discrimination (2016), at

---

[7] Plaintiff presents these claims with citations to her Declaration in the "Facts" section of her Opposition brief.  *See* Pl.'s Opp'n at 6-8.  But Defendant is correct that she does not address them in her argument concerning her hostile work environment claim.  *See id.* at 20-21.  Nonetheless, the Court considers these incidents as part of its "totality of the circumstances" review of Plaintiff's hostile work environment claim.  *See infra* Section III(C).

SUNOVIAN 0000951).  Plaintiff fails to offer any evidence other than her own speculation to controvert Ms. Russell's and Ms. Warden's testimony that they never discussed Plaintiff and were not aware of her EEO activity.  Accordingly, the Court considers these facts undisputed for the purpose of the present motion.

## II.  LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The mere existence of some factual dispute is insufficient on its own to bar summary judgment; the dispute must pertain to a "material" fact.  *Id.*  Accordingly, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Nor may summary judgment be avoided based on just any disagreement as to the relevant facts; the dispute must be "genuine," meaning that there must be sufficient admissible evidence for a reasonable trier of fact to find for the non-movant.  *Id.*

In order to establish that a fact is or cannot be genuinely disputed, a party must (a) cite to specific parts of the record—including deposition testimony, documentary evidence, affidavits or declarations, or other competent evidence—in support of its position, or (b) demonstrate that the materials relied upon by the opposing party do not actually establish the absence or presence of a genuine dispute.  Fed. R. Civ. P. 56(c)(1).  Conclusory assertions offered without any factual basis in the record cannot create a genuine dispute sufficient to survive summary judgment.  *See Ass'n of Flight Attendants-CWA, AFL-CIO v. Dep't of Transp.*, 564 F.3d 462, 465-66 (D.C. Cir. 2009); *see also Sibert-Dean v. Wash. Metro. Transit Auth.*, 751 F. Supp. 2d 87, 90 (D.D.C. 2010) (requiring the non-moving party's factual representations in a sworn affidavit to be supported by

facts in the record).  Moreover, where "a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the district court may "consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e).

When faced with a motion for summary judgment, the district court may not make credibility determinations or weigh the evidence; instead, the evidence must be analyzed in the light most favorable to the non-movant, with all justifiable inferences drawn in her favor. *Liberty Lobby*, 477 U.S. at 255.  If material facts are genuinely in dispute, or undisputed facts are susceptible to divergent yet justifiable inferences, summary judgment is inappropriate.  *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009).  The district court's task is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251-52.  In this regard, the non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50 (internal citations omitted).

In recognition of the difficulty in uncovering clear evidence of discriminatory or retaliatory intent, the district court should approach summary judgment in an action for employment discrimination or retaliation with "special caution."  *Aka v. Wash. Hosp. Ctr.*, 116 F.3d 876, 879-80 (D.C. Cir. 1997), *vacated on other grounds*, 156 F.3d 1284 (D.C. Cir. 1998) (*en banc*).  But the Court's "special caution" does not relieve the plaintiff of her burden to support her allegations with competent evidence.  *See Brown v. Mills*, 674 F. Supp. 2d 182, 188 (D.D.C. 2009).  As in any context, where the plaintiff would bear the burden of proof on a dispositive issue at trial, at the summary judgment stage she bears the burden of production to

designate specific facts showing that there exists a genuine dispute requiring trial. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009). Otherwise, the plaintiff could effectively defeat the "central purpose" of the summary judgment device—namely, "to weed out those cases insufficiently meritorious to warrant . . . trial"—simply by way of offering conclusory allegations, speculation, and argument. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

### III. DISCUSSION

The Court shall grant in part and deny in part Defendant's motion for summary judgment for the reasons set forth below. Although a close call, the Court finds that there are genuine disputes of material fact with respect to Plaintiff's racial discrimination claim predicated on her allegations that Defendant removed target customers from her and another African American sales representative to the benefit of white sales representatives. On this allegation only, the Court concludes that a reasonable jury could find for Plaintiff based on the present record. As to the remaining actions underlying Plaintiff's racial discrimination claim, as well as her disability and age discrimination, retaliation, and hostile work environment claims, the Court concludes that summary judgment in Defendant's favor is warranted.

### A. Discrimination Claims (Counts 1, 3, 4)

Plaintiff alleges that Defendant discriminated against her and subjected her to disparate treatment and adverse employment actions based on (1) her race as an African American woman in violation of Title VII; (2) her age (over 40 years old) in violation of the ADEA; and (3) her disability in violation of the ADA. As set forth below, the Court shall grant summary judgment to Defendant with respect to Plaintiff's discrimination claims predicated on her age (Count 3) and disability (Count 4) because Plaintiff has failed to offer any evidence showing that Defendant's actions were based on Plaintiff's age or disability. The Court also grants summary

24

judgment to Defendant with respect to Plaintiff's claims of racial discrimination (Count 1),
*except* regarding her claim that Defendant "removed" target customers from her and another
African American sales representative.  For this action only, disputes of material fact preclude
the Court from granting summary judgment to Defendant.

### 1.   Racial Discrimination under Title VII (Count 1)

Under Title VII, an employer may not "discriminate against any individual with respect
to [her] compensation, terms, conditions, or privileges of employment, because of such
individual's race, color, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1).  To prove a claim of
racial discrimination under Title VII, a plaintiff must demonstrate that the actions taken by an
employer were "more likely than not based on the consideration of impermissible factors,"
including race. *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 254 (1981) (internal
citation omitted).  Absent direct evidence of discrimination,[8] the plaintiff may indirectly prove
discrimination pursuant to the tripartite burden-shifting articulated in *McDonnell Douglas Corp.
v. Green*, 411 U.S. 792 (1973).  "Under *McDonnell Douglas*, the plaintiff has the initial burden
of production to establish a prima facie case of discrimination; if she does, then the employer
must articulate a legitimate, non-discriminatory reason for its action; and if it does, then the
plaintiff must receive an opportunity to show that the employer's reason was a pretextual cover
for discrimination." *Wang v. Wash. Metro. Area Transit Auth.*, 206 F. Supp. 3d 46, 64 (D.D.C.
2016) (citing *McDonnell Douglas*, 411 U.S. at 802-05).

---

[8] "Direct evidence of discrimination is evidence that, if believed by the factfinder, proves the
particular fact in questions *without any need for inference*." *Brown v. Small*, 437 F. Supp. 2d
125, 130 n.7 (D.D.C. 2006) (emphasis in original) (citing *Randle v. LaSalle Telecomms., Inc.*,
876 F.2d 563, 569 (7th Cir. 1989)).

To establish a prima facie case of racial discrimination under Title VII, a plaintiff must demonstrate that she suffered an adverse employment action because of her race.  *See Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008).  On summary judgment, however, if the employer puts forth a "legitimate, non-discriminatory reason" for its actions, the "question whether the employee actually made out a prima facie case is no longer relevant." *Id.* at 493 (internal citations and quotation marks omitted).  "[W]here an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*." *Id.* at 494 (emphasis in original).  Rather, "the district court must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee[?]" *Id.* (citations omitted).  If a plaintiff fails to produce evidence sufficient for a reasonable jury to find that the employer's legitimate, non-discriminatory reason was not the actual reason for the employer's action, then summary judgment in favor of the employer is proper. *See id.* at 496-97.

### a.  "Partially Meets Expectation" Rating and PIP Placement

Defendant argues that it is entitled to summary judgment on Plaintiff's racial discrimination claim based on Plaintiff's receipt of a "Partially Meets Expectations" rating and her PIP placement because (1) these actions do not constitute "adverse employment actions"; (2) Defendant articulated  legitimate non-discriminatory reasons for Plaintiff's performance rating and PIP placement; and (3) Plaintiff failed to offer evidence of discriminatory pretext.  Def.'s Mot. at 10-16.   Plaintiff argues that the PIP disqualified her from applying for a sales trainer

26

position and that Defendant's explanation is pretextual because similarly situated white

employees did not receive negative reviews and were not placed on PIPs.  Pl.'s Opp'n at 11,

13-14.  The Court concludes that Defendant has offered legitimate, non-discriminatory reasons

for Plaintiff's negative performance review and PIP placement, which Plaintiff has failed to rebut

by offering sufficient evidence of discriminatory pretext.

### i.   Adverse Employment Actions

Although the Court need not determine whether Plaintiff made out a prima facie case of

racial discrimination, *see Brady,* 520 F.3d at 493, when an employer's action does not clearly

qualify as an "adverse employment action," the Court "must still first determine whether plaintiff

suffered an adverse employment action."  *Wang*, 206 F. Supp. 3d at 65 (internal citations and

quotation marks omitted).  An "adverse employment action" is "a significant change in

employment status, such as hiring, firing, failing to promote, reassignment with significantly

different responsibilities, or a decision causing significant change in benefits."  *Douglas v.*

*Donovan*, 559 F.3d 549, 552 (D.C. Cir. 2009) (internal citations and quotation marks omitted).

An "employment decision does not rise to the level of an actionable adverse action . . . unless

there is a tangible change in the duties or working conditions constituting a material employment

disadvantage." *Stewart v. Evans*, 275 F.3d 1126, 1134 (D.C. Cir. 2002) (internal citations and

quotation marks omitted).

"Ordinarily, negative performance evaluations do not constitute adverse employment

actions."  *Morgan v. Vilsack*, 715 F. Supp. 2d 168, 174 (D.D.C. 2010) (citing *Douglas*, 559 F.3d

at 552); *see also Walden v. Patient-Centered Outcomes Research Inst.*, 304 F. Supp. 3d 123, 137

(D.D.C. 2018) (finding that a negative annual performance review was not an adverse

employment action because plaintiff did not claim that her evaluation resulted in a reduction in

compensation or any significant change in her employment status).  Nor do PIPs typically amount to adverse employment actions.  *See Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003) (finding that PIP was not an adverse employment action because plaintiff did not present evidence suggesting she suffered any significant change in employment status); *Walden*, 304 F. Supp. 3d at 137-38 (finding that PIP with warning that non-compliance could lead to termination was not an adverse employment action).  Negative reviews and PIPs may qualify as adverse employment actions "only when attached to financial harms, such as evaluations that could affect the employee's position, grade, level salary or promotion opportunities." *Webster v. U.S. Dep't of Energy*, 443 F. Supp. 3d 67, 81 (D.D.C. 2020) (internal citations omitted).

Defendant argues that Plaintiff's negative performance rating does not amount to an "adverse employment action" because there were no consequences associated with it.  *See* Def.'s Mot. at 11; Def,'s Stmt. ¶¶ 31, 46; Russell Dep. 43:10-13.  Defendant also argues that placing Plaintiff on a PIP was not an adverse employment action because it caused no change to her employment status and was designed to improve her sales.  Def.'s Mot. at 11; Def.'s Stmt. ¶ 34.

In response, Plaintiff argues that any action resulting in a "potential" loss of compensation is "adverse." [9]  Pl.'s Opp'n at 12-13.  But Plaintiff offers no evidence suggesting that her "Partially Meets Expectations" rating resulted even in any *potential* loss of compensation.  *See* Def.'s Reply at 7-8.  Plaintiff instead offers the puzzling argument that

---

[9] Plaintiff first argues that *any* employer personnel action constitutes an adverse employment action, regardless of its "potential detrimental effect." Pl.'s Opp'n at 12.  In support of this argument, Plaintiff cites only two amicus briefs by the U.S. Department of Justice. *Id.* Plaintiff's position is plainly not the law of this Circuit. *See, e.g.*, *Douglas*, 559 F.3d at 552 ("An adverse employment action . . . is a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits."); *Taylor*, 350 F.3d at 1293 (same).  Accordingly, the Court considers Plaintiff's arguments applying the binding precedent cited in her discussion.

Defendant "used the natural result of the devalued territory to discipline [Plaintiff] for not meeting sales targets and quotas."  Pl.'s Opp'n at 13. Assuming Plaintiff considers her negative performance review "discipline," Plaintiff's own sworn declaration undermines this claim. Plaintiff alleges that Ms. Russell "removed" her targets in April or May 2016—during Defendant's *2016* fiscal year.  Pl.'s Decl. ¶ 22.  But Plaintiff's "Partially Meets Expectations" rating was based on her *2015* fiscal year performance.  *See* FY2015 Review.  Plaintiff has presented no other evidence to demonstrate that any territory was "removed" or "devalued" based on her receipt of a "Partially Meets Expectations" rating, nor has she pointed to any other "materially adverse consequence" resulting from her receipt of this rating for her 2015 sales performance.  *Douglas*, 559 F.3d at 552 (internal quotation marks and citations omitted). Standing alone, her negative performance review does not constitute an actionable adverse employment action.  As discussed *infra*, even assuming her performance review is an adverse action, Defendant has offered legitimate, non-discriminatory reasons for her performance rating.

Plaintiff, however, offered evidence that her PIP placement precluded her from applying for a sales trainer position.  Pl.'s Decl. ¶ 29.[10]  Construing the evidence and drawing inferences most favorably to Plaintiff, the Court concludes that her PIP placement could be adverse by disqualifying her from applying for a promotion.  But the Court need linger on the strength of

---

[10] Plaintiff argues that this Court "already acknowledged that [Plaintiff's] negative performance review and PIP constitute adverse actions given their connection 'to reduced opportunities to meet her quota, reduced opportunities to compete for bonuses, and material change in employment responsibility based on a diminished customer base and sales territory.'"  Pl.'s Opp'n at 13 (citing Mem. Op. at 15-16, ECF No. 26).  In fact, the Court concluded at the *motion to dismiss* stage that Plaintiff had "*pled facts* sufficient *to allege* an adverse employment action." Mem. Op. at 16 (emphasis added).

Plaintiff's prima facie case because Defendant has offered legitimate, non-discriminatory reasons for Plaintiff's "Partially Meets Expectations" rating and subsequent PIP placement.

### ii.   Legitimate, Non-Discriminatory Reason

Defendant offers Plaintiff's "poor sales" as its non-discriminatory reason for Plaintiff's performance rating and PIP placement. Def.'s Mot. at 11. Defendant has produced ample evidence demonstrating that Plaintiff fell short of her sales quotas throughout the 2015 fiscal year. *See supra* at Section I(B)(2)(a); Def's Mot. at 12. For example, Plaintiff attained 0% of her Aptiom goal throughout the first two trimesters, and only 12% for the third trimester. Def.'s Mot. at 12; *see* FY2015 Review. Although Plaintiff performed better with Brovana sales, her combined payout ranked low among her colleagues. Def.'s Stmt. ¶ 29. Defendant also points to evidence that Plaintiff continued to fall short of her quota goals through the beginning of the 2016 fiscal year, even after being warned that she needed to improve her sales. *See* PIP at SUNOVIAN 0000223. Furthermore, Defendant's employees testified that supervisors assigned performance ratings based objectively on how a sales representative's performance "stack ranked" against all other sales representatives' quota attainment. *See* Russell Dep. 47:11-17; Warden Dep. 50:7-20; 52:15-53:12.

The Court finds that Defendant's evidence of Plaintiff's continued quota deficiencies, together with its evidence about its objective assignment of performance ratings, presents a legitimate, non-discriminatory reason for Plaintiff's "Partially Meets Expectations" rating and subsequent PIP placement.

### iii.   Evidence of Pretext

Because Defendant has articulated a legitimate, non-discriminatory reason for Plaintiff's negative performance review and PIP placement, the burden shifts to Plaintiff to produce

evidence from which a reasonable jury could find Defendant's stated reason is pretext for

discrimination.  *See Brady*, 520 F.3d at 494; *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109,

1114 (D.C. Cir. 2016).  "A plaintiff can demonstrate that the employer's stated reason was 'not

the actual reason' by 'produc[ing] evidence suggesting that the employer treated other employees

of a different race . . . more favorably in the same factual circumstances' or by showing that the

employer 'is making up or lying about the underlying facts[.]'"  *Moses v. Kerry*, 110 F. Supp. 3d

204, 209 (D.D.C. 2015) (quoting *Brady*, 520 F.3d at 495).

    Plaintiff first attempts to demonstrate discriminatory pretext by pointing to two white

colleagues who—according to Plaintiff—did not meet sales quotas, but were not given poor

evaluations or placed on PIPs.  Pl.'s Opp'n at 14-16.  Evidence demonstrating that "similarly

situated employees were treated differently . . . give[s] rise to the inference that the plaintiff was

treated less favorable on account of [her] protected status." *Walker v. McCarthy*, 170 F. Supp. 3d

94, 108 (D.D.C. 2016) (internal citations omitted).  To raise an inference of discrimination

through the use of a comparator, the plaintiff must "demonstrate that *all* of the relevant aspects

of [her] employment situation were *nearly identical* to those of the other employee." *Id.*

(emphasis added) (internal citations and quotation marks omitted).  Although "the question of

whether employees are similarly situated in order to show pretext ordinarily presents a question

of fact for the jury," the Court may determine at the summary judgment stage whether the

plaintiff has produced sufficient evidence to show that "the comparators were actually similarly

situated to [her]."  *Walker*, 170 F. Supp. 3d at 108 (internal citations and quotation marks

omitted).  If the plaintiff fails to produce such evidence, "an inference of falsity or discrimination

is not reasonable and summary judgment is appropriate." *Id.* (internal citations and quotation

marks omitted).

Here, Plaintiff has failed to produce sufficient evidence that the two comparators to whom she cites were "actually similarly situated" to her. *See id.* Plaintiff argues that two white colleagues—Mr. Jason Mitchell and Ms. Jannie Camper—did not meet their sales quotas, but were not given poor evaluations or placed on PIPs. Pl.'s Opp'n at 15-16. Plaintiff provides no evidence showing that these two representatives had similar sales figures to her *throughout* the 2015 fiscal year and into the beginning of the 2016 fiscal year—or that they continued to fall short of quota attainments for *both* Aptiom and Brovana. She points only to periodic "scorecards" that do not capture her colleagues' performance across both of their products throughout the year. *See supra* Section I(B)(2)(a). Because Plaintiff failed to produce evidence showing that she, Ms. Camper, and Mr. Mitchell were "actually similarly situated," an inference of discrimination is not reasonable. *See Walker*, 170 F. Supp. 3d at 108.

Plaintiff also attempts to show that Defendant's explanation is "unworthy of credence" by pointing to evidence that sales of Brovana were more important to Defendant than sales of Aptiom. *Reeves v. Sanderson*, 530 U.S. 133, 147 (2000) ("Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination[.]"). For example, Plaintiff states in her sworn declaration that she was told by Defendant's senior executives beginning in 2012 to focus on Brovana sales. *See* Pl.'s Decl. ¶ 14. Plaintiff also points to the July 2015 scorecard showing that 22 out of 48 sales representatives failed to make any sales of Aptiom, from which she concludes that Aptiom was "peripheral" to Defendant's business. *See* Pl.'s Stmt. ¶¶ 27-29. Plaintiff's own evidence, however, shows that she was notified in July 2015 of the expectation that every specialty sales representative sell Aptiom. *See* Pl.'s Opp'n Ex. E 7/20/15 Email from Darcy Hayes at P000081. And Plaintiff's FY2015 Mid-Year Review specifically notes that Plaintiff had achieved 0% of

her Aptiom attainment and advises her to improve her sales in that area.  *See* FY2015 Mid-Year Review.  Accordingly, Plaintiff was on notice that she needed to improve her Aptiom sales, despite her perception that Brovana sales were more important to the company.

The Court concludes that Plaintiff has failed to produce sufficient evidence of pretext to rebut Defendant's legitimate, non-discriminatory explanation that her "Partially Meets Expectations" performance review and PIP placement were due to her continued failure to achieve her sales goals for Aptiom and Brovana.  Because no reasonable juror could conclude that Defendant's actions were pretext for discrimination, the Court grants summary judgment to Defendant to the extent Plaintiff's racial discrimination claims rely on her performance review and PIP.

### b.  Removal and Reassignment of "Target" Customers

Defendant next argues that it is entitled to summary judgment on Plaintiff's claim that Defendant caused her territory to be "devalued" by removing her "target" customer and assigning that customer to a white sales representative because Ms. Russell was not involved in allocating territory or customers.[11]  Def.'s Reply at 11-12.  Defendant does not contest that, if true, Plaintiff's allegations amount to an "adverse employment action."  Defendant, however,

---

[11] Plaintiff's allegations on this point are somewhat difficult to follow.  In some instances, she describes her "territory" being "devalued," *see, e.g.*, Pl.'s Opp'n at 7, 11, 13, but elsewhere she alleges that her "territory" was taken away, *see* Pl.'s Opp'n at 15.  She also describes target customers being taken away from her and assigned to other sales representatives.  *See id.* at 7 (describing "the removal of Dr. Tuli as Ms. Sims['] target").  In this Section, the Court considers Plaintiff's claim that a target customer was "removed" from her and assigned to a white sales representative, as well as her allegations that a similar event occurred with Mr. Elam.  *See id.* ("Mr. Elam's territories, including hospitals, durable medical equipment companies, nursing homes and physicians were removed from him and credited to [Ms.] Camper.").  To the extent Plaintiff suggests that her classification as a "small" territory representative "devalued" her area, that claim is discussed *infra* Section III(A)(1)(c).

disputes that *Ms. Russell* "removed" or "approved" the removal of Plaintiff's customers. *See* Def.'s Reply at 11-12. Defendant points to Ms. Russell's deposition testimony in which she stated that she did not recall reassigning any doctors from Plaintiff to anyone else, Russell Dep. 59:5-11, that she did not recall removing any of Mr. Elam's territory, *id.* at 27:2-8, and that she was "not the one who normally makes territory changes," *Id.* at 27:4-8. Defendant also points to testimony by Ms. Warden, who stated that an "outside vendor" determines "territories." Def.'s Reply at 12; Warden Dep. 45:6-18; 56:10-15. Defendant argues that it is entitled to summary judgment on this claim because this evidence shows that Ms. Russell did not reassign their "target" customers, which undermines Plaintiff's claim that it was the result of intentional discrimination.

Plaintiff, however, states in her sworn declaration: "Despite my protests, the removal of Dr. Tuli as my target was approved by Ms. Russell to give to Leonora Merkey, a Caucasian female in April/May 2016." Pl.'s Decl. ¶ 22. Plaintiff also points to Mr. Elam's declaration, in which he states that customers were removed from him and allocated to a white sales representative, Ms. Camper. Elam Decl. ¶ 6. Mr. Elam further states that he complained about these changes to Ms. Russell and her supervisor, and they did not address his concerns. *Id.*

The Court has carefully considered the entire record in this case and concludes that there is a genuine dispute of material fact as to *who* "removed" customers from Plaintiff and Mr. Elam. Plaintiff offers sworn declarations stating that Ms. Russell either "approved" of or knew about the re-assignment of customers from African American employees to white employees. To be sure, Defendant disputes this point, and has competing evidence to support its position. Defendant has offered testimony from Ms. Russell indicating that she did not make changes to sales representatives' customers or territories. However, at the summary judgment stage the

34

Court cannot make credibility determinations or weigh the evidence—instead, it must analyze the evidence in the light most favorable to Plaintiff, with all justifiable inferences drawn in her favor. *Liberty Lobby*, 477 U.S. at 255.  Doing so here, the Court concludes that Plaintiff's declaration, together with Mr. Elam's declaration, provide enough evidence for a reasonable jury to disbelieve the employer and conclude that the employer acted, at least in part, "for a prohibited reason."  *Walker v. Johnson*, 798 F.3d 1085, 1096 (D.C. Cir. 2015).

In reaching this conclusion, the Court also considers the evidence of pretext for racial discrimination offered by Plaintiff.  Specifically, Plaintiff provides testimony and sworn declarations recounting a sales meeting during which Ms. Russell gave her a key with the word "Diva" and Mr. Elam a key with M&M candies, but gave a white sales representatives a key with American flags.  *See* Pl.'s Dep. at 279:3-17; Pl.'s Decl. ¶ 19; Elam Decl. ¶ 5.  In considering this evidence, the Court does not make any conclusions about whether Ms. Russell's key selection was motivated by racial animus.  The Court merely finds that such evidence— considered together with evidence that customers were removed from Mr. Elam and Plaintiff while under Ms. Russell's supervision—evinces a pattern of disparate treatment of Plaintiff and Mr. Elam sufficient for a reasonable juror to conclude that it was pretext for discrimination.  Accordingly, the Court shall deny summary judgment on Plaintiff's racial discrimination claim based on the alleged "removal" of target customers.

### c.   "Multiplier" Compensation Policy

Defendant further argues that it is entitled to summary judgment on Plaintiff's claim that Defendant maintained a "multiplier" policy that discriminated against her and Mr. Elam by forcing them to meet higher sales quotas in order "to obtain the same awards as [their] non African American counters."  Pl.'s Decl. ¶ 7.  According to Plaintiff, she and Mr. Elam were

35

designated as "small market" sales representatives who were required to achieve 110% of their

sales quotas whereas "large market" sales representatives only had to achieve 100% of their sales

goals.  *Id.*  Plaintiff suggests that she and Mr. Elam were the only people affected by this policy.

Pl.'s Opp'n at 16.

      The record indicates that Defendant developed separate payout curves for representatives

in "small" territories and "large" territories to equalize earnings opportunity across products and

territories.  *See supra* Section I(B)(2)(c) (discussing payout curves). The ICP (including its

payout curves) was "reviewed and approved" by Defendant's senior executives and applied

uniformly to all sales representatives.  FY2015 ICP at 35.  The Court concludes that the evidence

offered by Defendant regarding this compensation policy presents an objective,

non-discriminatory rationale for the different payouts for large versus small territories.

      Contrary to Plaintiff's allegations, moreover, the record shows that Plaintiff and Mr.

Elam were *not* the only sales representatives designated as "small" territory representatives.  Mr.

Mitchell (a white male sales representative) had the same "small" territory designation as

Plaintiff and Mr. Elam.  *See* Pl.'s Interrogatory Resps. at 17.  Accordingly, Plaintiff's argument

that this policy unfairly affected the African American sales representatives fails, as she failed to

provide any other evidence of pretext on the basis of race.  Because of this failure, Defendant is

entitled to summary judgment on Plaintiff's racial discrimination claim to the extent it relies on

allegations of an unfair "multiplier" compensation policy.

### 2.  Age Discrimination (Count 3)

      Defendant argues that it is entitled to summary judgment on Plaintiff's age discrimination

claim because Plaintiff has failed to show that any adverse employment action was taken

"because of" her age.  *See* Def.'s Mot. at 9-13.  Under the ADEA, it is "unlawful for an employer

36

. . . [to] discriminate against any individual [at least 40 years of age] with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. §§ 623(a), 631(a).  The Supreme Court has directed that a plaintiff can only establish liability under the ADEA if she proves "by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180 (2009).  In analyzing a discrimination claim under the ADEA, courts apply the same framework developed in the context of Title VII litigation: "where direct evidence of discriminatory intent is not available, a party may establish unlawful age discrimination by relying on the familiar burden-shifting scheme first articulated in [*McDonnell Douglas*]." *Hall v. Giant Food, Inc.*, 175 F.3d 1074, 1077 (D.C. Cir. 1999) (citing *Paquin v. Fed. Nat'l Mortg. Ass'n*, 119 F.3d 23, 26 (D.C. Cir. 1997)).  As with a Title VII racial discrimination claim, "[a]t the summary judgment stage, the operative question is whether the employee produced sufficient evidence for a reasonable jury to find that . . . the employer intentionally discriminated against the employee on the basis of age." *Wilson v. Cox*, 753 F.3d 244, 247 (D.C. Cir. 2014) (internal citations and quotation marks omitted).

The Court concludes that Plaintiff has failed to produce evidence sufficient for a reasonable jury to conclude that any of Defendant's actions were based on her age, let alone that her age was the "but-for" cause of any adverse employment action.  Absent any evidence from which a factfinder reasonably could conclude that the Defendant's explanation is pretextual, or that Plaintiff's age played any role in Defendant's actions, the Court grants summary judgment for Defendant on Plaintiff's ADEA claim.  *See Jenkins v. District of Columbia*, 281 F. Supp. 3d 77, 87 (D.D.C. 2017) (granting summary judgment to employer because plaintiff "provide[d] no

evidence supporting the inference" that the employer's decision "was based on age rather than legitimate reasons").

As an initial point, courts in this jurisdiction have held that "a decision-maker's inclusion in the same protected class as the [plaintiff] cuts against any inference of discrimination." *Ranowsky v. Nat'l R.R. Passenger Corp.*, 244 F. Supp. 3d 138, 144 (D.D.C. 2017) (citing *Gonda v. Donahoe*, 79 F. Supp. 3d 284, 296 (D.D.C. 2015); *Perry v. Shinseki*, 783 F. Supp. 2d 124, 138 (D.D.C. 2011)).  Here, any inference of age discrimination is undercut by the fact that Ms. Russell was in the same age category (over 40 years old) as Plaintiff.  *See* Russell Dep. 10:16-22.

With respect to Plaintiff's performance review and PIP placement allegations, the Court adopts its discussion from Section III(A)(1)(a)(i) *supra* regarding whether these actions amount to "adverse employment actions" and Defendant's legitimate, non-discriminatory reasons for these actions, *supra* Section III(A)(1)(a)(ii).  Accordingly, the operative question is whether Plaintiff has produced sufficient evidence for a reasonable jury to conclude that Defendant intentionally discriminated against her based on her age.  *See Wilson*, 753 F.3d at 247.

The Court concludes that Plaintiff has failed to do so.  Plaintiff points to no evidence suggesting that she received a "Partially Meets Expectations" rating or was placed on a PIP due to her age.  Although Plaintiff omits comparator arguments related to age from her Opposition brief, she suggests elsewhere that Mr. Mitchell and Ms. Camper—both of whom are "younger"—are possible comparators.  *See* Sec. Am. Compl. ¶ 17; Pl.'s Interrogatory Resps. at 30; Pl.'s Dep. 333:12-16.  But any comparator arguments with respect to her age discrimination claim suffer from the flaws discussed above in Section III(A)(1)(a)(iii): she has failed to produce evidence showing that these comparators are "actually similarly situated" in their sales

performance to give rise to an inference of age discrimination.[12]  *See Walker*, 170 F. Supp. 3d at

108.  Plaintiff also provides no other evidence of pretext—for example, she could not recall at

her deposition any age-related comments made to her.  *See* Pl.'s Dep. 333:17-334:8.

Plaintiff also omits from her Opposition any argument that the "removal" of target

customers or her classification as a "small" territory representative was based on her age.  Her

discussion of these events focuses on her allegations of racial discrimination.  *See, e.g.*, Pl.'s

Opp'n at 16 (noting that "non African American employees reaped the rewards of their African

American counterpart's territory devaluation and suffered none of the discipline").  By failing to

address these arguments, Plaintiff has conceded them.  *See Glass v. Lahood*, 786 F. Supp. 2d

189, 210 (D.D.C. 2011) ("In this circuit it is well understood . . . that when a plaintiff files an

opposition to a dispositive motion and addresses only certain arguments raised by the defendant,

a court may treat those arguments that the plaintiff failed to address as conceded.") (internal

citations and quotation marks omitted).

Because Plaintiff has failed to produce any evidence connecting any of Defendant's

actions to her age, the Court concludes that Defendant is entitled to summary judgment on Count

3 of the Second Amended Complaint.

---

[12] The Court also notes that there is no evidence on the record confirming that either Mr. Mitchell or Ms. Camper was actually outside of Plaintiff's protected age category.  *See Wheeler*, 812 F.3d at 1115-18 (noting that plaintiff may demonstrate pretext by showing "the employer's better treatment of similarly situated employees *outside the plaintiff's protected group*") (emphasis added).

### 3.  Disability Discrimination (Count 4)

Defendant argues that Plaintiff's disability discrimination fails as a matter of law because Ms. Russell was unaware of Plaintiff's disability, and therefore could not have taken any adverse employment action "because of" her disability.  Def.'s Mot. at 17-19.

Under the ADA, no covered employer "shall discriminate against a qualified individual on the basis of disability in regard to . . . [the] terms, conditions, and privileges of employment." 42 U.S.C. 12112(a).  As with a Title VII case, the plaintiff may indirectly prove discrimination under the *McDonell Douglas* burden-shifting analysis.  *See Adeyemi v. District of Columbia*, 525 F.3d 1222, 1227 (D.C. Cir. 2008).  To prove a disability discrimination claim under the ADA, a plaintiff must show that she (1) had a disability within the meaning of the statute; (2) was qualified for the position with or without a reasonable accommodation, and (3) suffered an adverse employment action because of her disability.  *Walden*, 304 F. Supp. 3d at 133 (citing *Swanks v. Wash. Metro. Area Transit Auth.*, 179 F.3d 929, 934 (D.C. Cir. 1999)); *see also Adeyemi*, 525 F.3d at 1226 ("[T]he two basic elements of a disability discrimination claim are (i) the plaintiff suffered an adverse employment action (ii) because of [her] disability.").  Here, the parties do not dispute that Plaintiff had a disability or that she was qualified for her position with or without reasonable accommodation.  Rather, Defendant argues that it is entitled to summary judgment on Plaintiff's ADA claim because (1) Plaintiff cannot show any adverse action taken by Defendant "because of" her disability; and (2) there is no evidence suggesting Defendant's actions were pretext for discrimination. Def.'s Mot. at 17-18.

The Court agrees that Plaintiff has produced no evidence to establish that any of adverse actions alleged in her Complaint occurred *because of* her disability.  The only evidence pertaining to Plaintiff's disability suggests that neither Ms. Warden nor Ms. Russell had any

knowledge of Plaintiff's disability. *See* Def's Stmt. ¶¶ 17, 57.  Plaintiff does not dispute that

neither of supervisors knew about her disability.  Pl.'s Stmt. ¶ 57.  It is "axiomatic" that a

defendant cannot be found to have discriminated against a plaintiff where the defendant had no

knowledge of the plaintiff's protected category.  *See Pollard v. Quest Diagnostics*, 610 F. Supp.

2d 1, 21 (D.D.C. 2009).

    In any event, the Court concludes that Defendant has offered legitimate,

non-discriminatory reasons for Plaintiff's "Partially Meets Expectations" review and PIP

placement for the same reasons described *supra* Section III(A)(1)(ii).  And, as with Plaintiff's

age discrimination claim, Plaintiff concedes that any "removal" of target customers or her

classification as a "small territory" representative had nothing to do with her disability by failing

to address those points in her Opposition.  *See supra* Section III(A)(2).  Moreover, Plaintiff has

not produced or cited to any evidence to show that Defendant's actions were pretext for

discrimination based on her disability.  Because Plaintiff has not offered any evidence allowing a

reasonable juror to conclude that Defendant discriminated against Plaintiff based on her

disability, summary judgment in favor of Defendant on Plaintiff's disability discrimination claim

is appropriate.

### B.  Retaliation Claim (Count 5)

    Defendant next argues that it is entitled to summary judgment on Plaintiff's retaliation

claim because Plaintiff has not offered evidence of any connection between her EEO complaint

in 2012 and Defendant's alleged actions in 2016 and because Defendant has offered legitimate,

non-discriminatory reasons for its actions.  Def.'s Mot. at 19-21. The Court shall grant summary

judgment to Defendant on Plaintiff's retaliation claims because there are no genuine disputes of

material fact as to whether Ms. Russell retaliated against Plaintiff because of her protected EEO activity in 2012.

To establish a prima facie case of retaliation under Title VII, a plaintiff must show that she (1) engaged in statutorily protected activity; (2) suffered a materially adverse action by her employer; and (3) "a causal link connects the two." *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009). However, where the employer proffers a non-retaliatory explanation for the adverse employment action, the sufficiency of the plaintiff's prima facie case is no longer in issue, and "the only question is whether the employee's evidence creates a material dispute on the ultimate issue of retaliation." *Id.* at 678.

Plaintiff does not dispute that *neither* Ms. Russell nor Ms. Warden had any knowledge of Plaintiff's 2012 EEO complaint. *See* Def.'s Stmt ¶¶ 19, 56 (citing Warden Dep, 54:15-55:2; Russell Dep. 27:9-11); Pl.'s Stmt. ¶¶ 19, 56. Because Plaintiff's supervisors had no knowledge of her protected EEO activity, they could not have retaliated against her *because of* that activity. *See Jones*, 557 F.3d at 679 ("We agree that Jones's supervisors could not have retaliated against him unless they had knowledge of his protected activity."). Plaintiff does not even provide evidence that *Sunovion* knew about her 2012 EEO charge against Ms. Warden. At most, the record indicates that Plaintiff did not pursue the charge in 2012 and the EEOC closed it without investigation. *See* Def.'s Stmt. ¶ 51 (citing Def.'s Mot. to Dismiss Ex. 1, ECF No. 22).

Although Plaintiff need not "provide direct evidence" that her supervisors knew of her protected EEO activity to survive summary judgment, she must rely on more than mere "speculation as to what could have transpired." *Walker v. England*, 590 F. Supp. 2d 113, 148 (D.D.C. 2008) (citing *Montgomery v. Chao*, 546 F.3d 703, 708 (D.C. Cir. 2008) ("The possibility that a jury might speculate in the plaintiff's favor . . . is simply insufficient to defeat summary

judgment)).  In support of her retaliation allegation, Plaintiff cites only to her own post-resignation EEO complaint in which she speculates about Ms. Warden and Ms. Russell's interactions during a "May managers meeting" in 2016.  *See* Pl.'s Opp'n at 19 (citing Pl.'s Opp'n Ex. D at SUNOVION 0000951).  Plaintiff's mere speculation that both supervisors *might* have known about her 2012 EEO charge and *might* have had a conversation about it is insufficient to establish a dispute of material fact.  Accordingly, summary judgment in favor of Defendant on Plaintiff's retaliation claim is appropriate.

**C.  Hostile Work Environment Claim (Count 6)**

Lastly, Defendant argues that it is entitled to summary judgment on Plaintiff's hostile work environment claim because she fails to present evidence of "severe or pervasive" conduct based on her race, age, or disability. Def.'s Mot. at 22-24.  To prove a hostile work environment, a plaintiff must demonstrate that the "workplace is permeated with discriminatory intimidation, ridicule, and insult" and that this behavior is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (internal citations and quotation marks omitted). "In determining whether a hostile work environment claim exists, [courts] look to 'all the circumstances,' including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002) (quoting *Harris*, 510 U.S. at 23).  This standard ensures that "Title VII does not become a general civility code," requiring the courts to "polic[e] the ordinary tribulations of the workplace." *Bonnett v. Skinseki*, 907 F. Supp. 2d 54, 80 (D.D.C. 2012) (internal citations and quotation marks omitted).

43

In her Complaint, Plaintiff alleges numerous incidents contributing to a hostile work environment.[13]  In her Opposition to Defendant's Motion for Summary Judgment, however, Plaintiff's argument focuses only on (1) the incident involving the "Diva" and "M&M" keys given to her and Mr. Elam; and (2) the re-assignment of customers from Plaintiff and Mr. Elam to white representatives.  *See* Pl.'s Opp'n at 21.  Plaintiff argues that these actions demonstrate Defendant's "preferential treatment of [Plaintiff's] non African American co workers" and treatment of Plaintiff and Mr. Elam as "second-class member[s] of the office." *Id.* (citation omitted).  Although Plaintiff focuses on these two incidents, the Court shall consider the "totality of the circumstances" surrounding Plaintiff's purported hostile work environment. *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (internal citations omitted).

Based on the record before the Court, Plaintiff cannot as a matter of law sustain a hostile work environment claim.  Although Plaintiff suggests that her supervisors' conduct created a hostile work environment based on her age and disability, *see* Sec. Am. Compl. ¶ 49, she does not respond to Defendant's arguments that there is no evidence on the record supporting that any of these alleged actions were based on her protected age or disability categories.  In her Opposition, Plaintiff discusses only examples of Defendant's purported "overt[ ] . . . racial preference," but declines to address Defendant's argument that Plaintiff has failed to demonstrate a hostile work environment based on age or disability.  Pl.'s Opp'n at 20-21; *see* Def.'s Mot. at

---

[13] *See, e.g.*, Sec. Am. Compl.  ¶ 49 (negative performance reviews, placement on a PIP, and reduced opportunity to meet her quotas and compete for bonuses due to diminution of her sales territory and removal of customers); *id.* ¶ 10 (Ms. Warden's refusal to approve business travel expenses); *id.* ¶¶ 11 (Ms. Warden's bringing her an alcoholic beverage despite Plaintiff's request for a non-alcoholic beverage); *id.* ¶ 12 (Ms. Warden's "subtraction" of "locations from Plaintiff's territory" and assignment of those location to other sales representatives); *id.* ¶ 19 (Defendant's "kicker" policy); *id.*  ¶ 21 (excluding positive aspects of Plaintiff's performance from her 2015 fiscal year review).

23.  Because Plaintiff has failed to contest Defendant's arguments, the Court shall, in an exercise

of its discretion, treat those arguments as conceded.  *See Glass*, 786 F. Supp. 2d at 210.

Plaintiff's remaining hostile work environment claim based on her race fails as a matter of law

for three reasons.

 First, Plaintiff relies in part on "work related actions by supervisors" which courts have

"generally rejected" as the basis of hostile work environment claims.  *Grosdidier v. Chairman,*

*Broadcasting Bd. of Governors*, 774 F. Supp. 2d 76, 110-11 (D.D.C. 2011); *see Nurriddin v.*

*Bolden*, 674 F. Supp. 2d 64, 94 (D.D.C. 2009) ("[T]he removal of important assignments,

lowered performance evaluations, and close scrutiny of assignments [cannot] be characterized as

sufficiently intimidating or offensive in an ordinary workplace context."); *Houston v. SecTek,*

*Inc.*, 680 F. Supp. 2d 215, 225 (D.D.C. 2010) ("Allegations of undesirable job assignment or

modified job functions and of [supervisor's] unprofessional and offensive treatment are not

sufficient to establish that [plaintiff's] work environment was permeated with discriminatory

intimidation, ridicule, and insult.") (internal citations and quotation marks omitted), *aff'd*, 407 F.

App'x. 490, 2011 WL 318401 (D.C. Cir. Jan. 31, 2011).  Many of the challenged actions here—

including Plaintiff's performance review and placement on a PIP—are the type of "work-related

actions by supervisors" that provide insufficient grounds for a hostile work environment claim.

*Grosdidier*, 774 F. Supp. 2d at 111.

 Second, Plaintiff has failed to present evidence to connect most of the actions underlying

her hostile work environment claim to her race.  "Courts in this jurisdiction have routinely held

that hostile behavior, no matter how unjustified or egregious, cannot support a claim of hostile

work environment unless there exists some linkage between the hostile behavior and the

plaintiff's membership in a protected class."  *Grosdidier*, 774 F. Supp. 2d at 108-09 (quoting

*Na'im v. Clinton*, 626 F. Supp. 2d 63, 73 (D.D.C. 2009)).  Except for the incident involving the "Diva" key, Plaintiff has produced no evidence connecting any alleged adverse actions to her race.  For example, Plaintiff has provided no evidence showing that Ms. Warden's alleged failure to approve travel expenses or purported attempt to bring Plaintiff an alcoholic drink had anything to do with Plaintiff's race.  Nor, as another example, has she shown that Ms. Russell's comment that she was "un-coachable" connected to her race.

Third, Plaintiff has not presented evidence sufficient for a reasonable jury to conclude that her workplace was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Harris*, 510 U.S. at 21 (internal citations and quotation marks omitted). Here, even considering the unrebutted incidents offered by Plaintiff (*see supra* Section I(B)(2)(e)), the predicate acts on which her hostile work environment claim rest are not severe or pervasive enough to suggest that Plaintiff suffered an abusive working environment.  In her Opposition, Plaintiff focuses on the March 2016 meeting during which Ms. Russell gave her a key with the word "diva" on it and gave Mr. Elam a key with "M&M" candies, while giving a white sales representative a key with an American flag, describing him as an "All American guy."  Pl.'s Opp'n at 21.  Plaintiff argues that this incident is similar to that of the plaintiff in *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 577 (D.C. Circuit 2013), whose supervisor called him a "young black man" and yelled a racial slur at him.  Pl.'s Opp'n at 21.  But in *Ayissi-Etoh*, the court allowed the plaintiff's hostile work environment claim to be submitted to a jury because his supervisor not only used a "deeply offensive" and "unambiguously racial epithet" when yelling at him, but also made explicit references to the plaintiff's race in declining to give him a raise. *Ayissi-Etoh*, 712 F.3d at 576-77 (internal citations omitted).  The isolated "key" incident offered

by Ms. Sims does not amount to similarly "severe or pervasive" conduct. And although Plaintiff

provides numerous other examples of other incidents with Ms. Warden and Ms. Russell]—many

of which Defendant does not rebut, *see supra* Section I(B)(2)(e)—these events are the types of

"simply petty, ordinary workplace disputes" insufficient to support a hostile work environment

claim absent evidence of a discriminatory motive. *Bonnette v. Shinseki*, 907 F. Supp. 2d 54, 80

(D.D.C. 2012).

      The facts alleged by Plaintiff, even if true, would not permit a reasonable jury to

conclude that Plaintiff's workplace was "permeated with discriminatory intimidation, ridicule,

and insult" to create an "abusive working environment." *Harris*, 510 U.S. at 21 (internal citation

and quotation marks omitted). Accordingly, the Court shall grant Defendant's motion for

summary judgment on Count 6 of the Second Amended Complaint.

## IV.  CONCLUSION

      For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART

Defendant's motion for summary judgment. The Court GRANTS summary judgment to

Defendant on Plaintiff's age discrimination (Count 3), disability discrimination (Count 4),

retaliation (Count 5), and hostile work environment (Count 6) claims. The Court also GRANTS

summary judgment on Plaintiff's racial discrimination (Count 1) claims relying her on negative

performance review, PIP placement, and "multiplier" policy allegations. However, the Court

DENIES summary judgment on Plaintiff's racial discrimination claim insofar as it relies on the

removal and re-assignment of customers from African American sales representatives to white

sales representatives. An appropriate Order accompanies this Memorandum Opinion.

                                    /s/
                              COLLEEN KOLLAR-KOTELLY
                              United States District Judge